**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA**,

        Plaintiff,

vs.                            Cr. No. 09-488 MCA

**AMETH CHOUNDOULL,**

        Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on Defendant Ameth Choundoull's *Motion to Suppress* [Doc. 38], filed May 13, 2009.  The Court held a hearing on the motion on July 13, 2009 and July 14, 2009.  Having considered the parties' submissions, the relevant law, the arguments of counsel, and otherwise being fully advised in the premises, the Court grants the motion.

**I.**    **<u>FINDINGS OF FACT</u>**

    I make the following Findings of Fact:

    **A.**    **<u>The Federal Motor Carrier Safety Regulations, the New Mexico Motor
Transportation Act, and the North American Standard Driver/Vehicle
Inspection Levels</u>**

1.    The Federal Motor Carrier Safety Regulations are set forth at 49 C.F.R. §§ 300-399,

the Federal Motor Carrier Safety Act.  <u>See</u> 49 C.F.R. §§ 300-399.

2.      The New Mexico Motor Transportation Act ("NM Motor Transportation Act") is set

        forth at Chapter 65, Articles 1, 3, and 5 of the New Mexico Statutes Annotated.  See

        N.M. STAT. ANN. § 65-5-1 (2003).

3.      Through its Administrative Code, the State of New Mexico has adopted and makes

        applicable to interstate and intrastate carriers, commercial motor vehicles, and drivers

        Parts 385, 387, 390, 391, 392, 393, 395, 396, and 397 of Title 49 of the Code of

        Federal Regulations.  See N.M. ADMIN. CODE tit.18, CH. 2, PART 3.

4.      As is relevant here, 49 C.F.R. § 393.9, which is captioned "Lamps operable,

        prohibition of obstructions of lamps and reflectors" provides, in pertinent part, that

        "[l]amps and reflective devices/material required by this subpart must not be obscured

        by the tailboard, or by any part of the load, or its covering by dirt, or other added

        vehicle or work equipment, or otherwise."  49 C.F.R. § 393.9(b).

5.      Section 65-3-9 of the NM Motor Transportation Act provides, in pertinent part, that

        "[t]he director shall adopt regulations not inconsistent with or more stringent than

        applicable federal safety standards concerning the following parts and accessories

        necessary for the safe operation of a commercial motor carrier . . . lighting devices.

        . . ."  N.M. STAT. ANN. § 65-3-9 (1978).

6.      As is relevant here, 49 C.F.R. § 395.8, which is captioned "Driver's record of duty

        status" provides, in pertinent part, that "every motor carrier shall require every driver

        used by the motor carrier to record his/her duty status for each 24 hour period [and

that d]rivers shall keep their records of duty status current to the time shown for the last change of duty status."  49 C.F.R.  § 395.8(a), (f)(1).

7.     Section 65-3-11 of the NM Motor Transportation Act provides, in pertinent part, that

> [t]he director shall adopt rules and regulations not inconsistent with nor more stringent than applicable federal safety standards concerning the hours of service of drivers.
>
>> A.    These regulations shall include but not be limited to maximum driving and on-duty time, travel time, maintenance of a driver's log or record of duty status. . . .

N.M. STAT. ANN. § 65-3-11(A) (1978).

8.     As is relevant here, 49 C.F.R. § 393.9, which is captioned "Inspection of motor vehicles in operation" provides, in pertinent part, that "[e]very special agent of the [Federal Motor Carrier Safety Administration] . . . is authorized to enter upon and perform inspections of a motor carrier's vehicles in operation and intermodal equipment in operation."  49 C.F.R. § 369.9(a).

9.     Finally, as is relevant here, 49 C.F.R. § 396.17, which is captioned "Periodic inspection" provides, in pertinent part, that "[e]very commercial motor vehicle must be inspected as required by this section. The inspection must include, at a minimum, the parts and accessories set forth in appendix G of this subchapter."  49 C.F.R. §396.17(a).

10.    The parts and accessories set forth in appendix G are:

a.     the brake system;

3

    b.      coupling devices;
    c.      the exhaust system;
    d.      the fuel system;
    e.      lighting devices;
    f.      safe loading;
    g.      the steering mechanism;
    h.      the suspension;
    i.      the frame;
    j.      the tires;
    k.      the wheels and rims;
    l.      windshield glazing; and
    m.      the windshield wipers.

49 C.F.R. Ch. III, Subch. B, App. G.

11.    Appendix G does not include as a vehicle's "parts and accessories" the cargo or contents of that vehicle.

12.    Section 65-5-1 of the NM Motor Transportation Act sets forth procedures for commercial motor vehicles entering or leaving the State, and generally requires that such vehicles stop at its ports of entry.   N.M. STAT. ANN. § 65-5-1(A).

13.    In addition to inspecting commercial vehicles to ascertain that they are in safe and roadworthy condition,

> the person in charge of the port of entry may *confirm the contents of the cargo* and the weight thereof and is authorized to interview operators to obtain information in respect thereto and, if in doubt as to the declared gross weight, may order the cargo weighed before issuing any clearance certificate for the motor vehicle[. . . ;] may *inspect the contents of the vehicle* to determine whether all taxes on gasoline and motor fuel and excise taxes on alcoholic liquors and all taxes on any other property have been fully paid[. . . ; and] *may inspect the vehicle and its contents* to determine whether all laws and all rules and regulations of the departments of this state with respect to public

4

> safety, health, welfare and comfort have been fully complied
> with.

N.M. STAT. ANN. § 65-5-1(C), (D), (E) (emphasis added).

14.     There is a port of entry at Gallup, New Mexico. See N.M. STAT. ANN. § 65-5-1.1.

15.     The Gallup port of entry accommodates the use of a "PrePass System," which allows

certain data relevant to documenting compliance with the State's regulatory scheme

for eligible commercial carriers to be transmitted and received electronically in lieu

of exchanging such information manually through a stop at the counter or credential

booth of a port of entry or weigh station.

16.     I take judicial notice of the description of the PrePass System as set forth in the

*Memorandum Opinion and Order* docketed as entry number 60 in United States v.

Saso Kirovski, 08cr367 MCA.

17.     Inspections conducted upon commercial motor vehicles are done pursuant to a

procedure called the "North American Standard Inspection Procedure" ("the North

American Standard").

18.     At the suppression hearing, Major Ronald Cordova of the New Mexico Motor

Transportation Police, described the North American Standard as

> where officers and . . . civilian inspectors go through . . . 80
> hours of training to learn how to inspect trucks; learn how to
> inspect logbooks [and] learn how to know when a vehicle or
> carrier has the authority to operate in the state or to operate in
> interstate commerce.

[Doc. 54 at 13 (Supp. Hrng. Testimony of Ronald Cordova)].

19.     The North American Standard contemplates six levels of inspection, and they are
        summarized on the web site for the Federal Motor Carrier Safety Administration
        ("FMCSA"). A printout of the web page describing the six levels of inspection was
        presented without objection at the suppression hearing and admitted as Exhibit A.
        [See Exh. A]

20.     As explained on the FMCSA's site, a Level I, or "North American Standard
        Inspection," is

> [a]n inspection that includes examination of driver's license,
> medical examiner's certificate and waiver, if applicable, alcohol
> and drugs, driver's record of duty status as required, hours of
> service, seat belt, vehicle inspection report, brake system,
> coupling devices, exhaust system, frame, fuel system, turn
> signals, brake lamps, tail lamps, head lamps, lamps on
> projecting loads, safe loading, steering mechanism, suspension,
> tires, van and open-top trailer bodies, wheels and rims,
> windshield wipers, emergency exits on buses and HM
> requirements, as applicable.

[Exh. A at 1].

21.     A Level II, or "Walk-Around Driver/Vehicle Inspection," is

> [a]n examination that includes each of the items specified under
> the North American Standard Inspection. At a minimum, Level
> II inspections must include examination of: driver's license,
> medical examinees certificate and waiver, if applicable, alcohol
> and drugs, driver's record of duty status as required, hours of
> service, seat belt, vehicle inspection report, brake system,
> coupling devices, exhaust system, frame, fuel system, turn
> signals, brake lamps, tail lamps, head lamps, lamps on
> projecting loads, safe loading, steering mechanism, suspension,
> tires, van and open-top trailer bodies, wheels and rims,
> windshield wipers, emergency exits on buses, and HM

6

requirements, as applicable. It is contemplated that the walk-around driver/vehicle inspection will include only those items which can be inspected without physically getting under the vehicle.

[Exh. A at 1].

22.   A Level III, or "Driver-Only Inspection," is "[a] roadside examination of the driver's license, medical certification and waiver, if applicable, driver's record of duty status as required, hours of service, seat belt, vehicle inspection report, and HM requirements, as applicable." [Exh. A at 1].[1]

23.   Of the three descriptions of Level I, Level II, and Level III inspections, only the description for a Level III inspection expressly states that it is to be done, or may be done, roadside.  [Exh. A at 1].

24.   However, Major Cordova repeatedly testified that the descriptions as set forth on the FMCSA's web site and in Exhibit A provide only a "brief synopsis" of the inspection process, as opposed to "a complete depiction" of the multi-step inspection process. [Doc. 54 at 43, 44].

25.   By contrast, Exhibits 13 and 14 are captioned, respectively, "North American Standard Level I Inspection Procedure" and "North American Standard Level II Inspection Procedure."  Exhibit 13 explains the 37-step process for conducting a Level I inspection, while Exhibit 14 similarly explains the 31-step process involved

---

[1]  Inspections conducted at Levels IV, V, and VI are, respectively, "Special Inspections;" a "Vehicle-Only Inspection;" and an "Enhanced NAS Inspection for Radioactive Shipments." [Exh. A at 1-2].  None of these inspections is at issue here.

in conducting a Level II inspection. [Exhs. 13, 14].

26.   I find and accept as credible Major Cordova's testimony that the descriptions set forth on the FMCSA's web site and in Exhibit A represent only a "brief synopsis" of the inspection process.

27.   In order to maintain minimum performance standards and to keep "regular certification," Motor Transportation Division ("MTD") officers are required, by both the federal government and the New Mexico Department of Public Safety Motor Transportation Division, to conduct 32 Level I inspections.

28.   An officer who fails to conduct the required 32 Level I inspections "will be sent back to remedial training, and [will] have to go back to the training again and start all over." [Doc. 54 at 83].

29.   Major Cordova confirmed that

> [t]here are performance standards. Any inspector or officer within the motor transportation police must conduct a minimum of 32 inspections per year to maintain their certifications. That is only to maintain their certifications. There are a minimum standard to meet the 23 federal goals that we have in regards to inspections, and also to meet our district goals.

[Doc. 54 at 18].

## B.   The Stop and Inspection of Defendant Ameth Choundoull's Commercial Motor Vehicle

30.   Defendant Ameth Choundoull is a truck driver, originally from Dakar, Senegal, in West Africa.  He has resided in the Unites States since 1993 and is a legal resident.

8

31.    Mr. Choundoull has worked as a truck driver for the past two and one-half years, and possesses a commercial driver's license, which was issued in the State of Georgia.

32.    As demonstrated at the suppression hearing, Mr. Choundoull speaks English. However, he testified that English is not his first language; French and Wolof[2] are.

33.    On February 2, 2009, Mr. Choundoull was driving a Freightliner truck and hauling a 53-foot Wabash trailer as he transported a load from Hickman, California to an intended destination of Greenwood, South Carolina.

34.    Mr. Choundoull's plan of travel took him from California, through Arizona, and then into New Mexico, through the Gallup port of entry.

35.    Mr. Choundoull is a participant in the PrePass System.

36.    Because Mr. Choundoull received a green light at the Gallup port of entry, he did not stop; instead, he continued on his way to South Carolina.

37.    Mr. Choundoull never reached his ultimate destination, however, because on February 4, 2009, he was stopped by MTD Officer Hermilo Lucero just east of milemarker 108, Interstate 40, near the Laguna Pueblo in New Mexico.

38.    Officer Lucero has been with the State of New Mexico, Department of Public Safety, Motor Transportation Police Department for approximately 8 years, and has been a police officer for a total of approximately 12 years.  Officer Lucero's duties as an MTD police officer include inspecting commercial vehicles and enforcing state and

---

[2]  Wolof is a language spoken in Senegal, Gambia, and Mauritania.  Wolof is the most widely spoken language in Senegal.  See http://en.wikipedia.org/wiki/Wolof_language.

federal laws applicable to commercial vehicles.

39.    According to Officer Lucero, on February 4, 2009, he was at work conducting "basic patrol operations" in Cibola County on Interstate 40.  Cibola County is near the Laguna Pueblo.  Officer Lucero defined "basic patrol operations" as being on the lookout for such traffic code violations as speeding; seat belt violations; intoxicated drivers; reckless drivers; and "blown" tires and lighting and air line violations on commercial vehicles.

40.    Officer Lucero is a K-9 officer, and on the day in question, he was accompanied by his canine partner, Rodey.  Officer Lucero and Rodey were in Officer Lucero's marked MTD patrol car.  Officer Lucero was in uniform.

41.    Officer Lucero testified that at on the morning of February 4, 2009, he was traveling eastbound on Interstate 40 when he came upon a tractor trailer bearing Georgia plates. Officer Lucero "was getting ready to pass him [when he] observed that two of the three [identification] lamps on the top of the trailer were inoperative."  [Doc. 54 at 93].

42.    According to Officer Lucero, the three identification lamps are not required to be illuminated during daytime hours but, if they are illuminated, they must be in good working order.  Otherwise, the driver is committing a traffic violation.  According to Officer Lucero, this is a violation for which he commonly stops people.

43.    Because of the inoperative identification lamps, Officer Lucero stopped Mr.

10

Choundoull and wrote out a citation charging Mr. Choundoull with a violation of NMSA § 65-3-9 and 49 C.F.R. § 393.9.  In the "Essential Facts" section of the citation, Officer Lucero wrote, "2 of 3 ID lamps defective, 2 outer lamps out." [Exhibit 7].

44.    By contrast, Mr. Choundoull testified as to his belief that his identification lamps were working, since (1) they appeared to be in working order when he conducted a walk-around inspection of the tractor trailer on the morning of February 4, 2009; and (2) inspectors at the Ehrenberg, Arizona port of entry had, on February 3, 2009, certified that Mr. Choundoull had repaired a defective headlamp for which he was cited in California on January 20, 2009. [See Exhs. F and G, "Notice to Appear/CHP 215"].

45.    Exhibit F depicts the front of the citation that Mr. Choundoull received on January 20, 2009, in Kern County, California, for an inoperative headlamp. [Exh. F].

46.    Exhibit G depicts the back side of the January 20, 2009 citation and certifies that the inoperative headlamp was repaired and that, as of February 3, 2009, Mr. Choundoull's tractor trailer had been "cleared." [Exh. G].

47.    At the suppression hearing, Mr. Choundoull admitted that the ticket itself speaks to only the fact that the headlamp violation had been corrected.

48.    I find that neither the ticket nor the inspectors' certification addresses the identification lamps.

49.     Exhibit 1 shows the three identification lamps in question. [Exh. 1].

50.     In Exhibit 1, the middle lamp is clearly illuminated.  However, I find from Exhibit

        1 that the two outer lamps appear to be at least partially obstructed by either tape or

        mud.

51.     I find and accept as credible Officer Lucero's testimony that he routinely stops people

        for driving with defective identification lamps.  I further find that, given the

        circumstances as they were known to him, it was objectively reasonable for Officer

        Lucero to have stopped Mr. Choundoull on the morning of February 4, 2009 for

        driving with defective identification lamps.

52.     Having made the stop, Officer Lucero then approached Mr. Choundoull from the

        passenger side.

53.     Officer Lucero testified that "on the way in[, he] made a note to [him]self that the

        lock and the seal were on the left side of the trailer." [Doc. 54 at 94].  This placement

        of the lock and the seal was significant because in his experience and training, Officer

        Lucero typically sees the lock and the seal on the right-side door, which is the door

        that allows access to the trailer.  Officer Lucero explained that the reason the seal and

        lock normally go on the right side of the trailer is "for the purposes of security of the

        load and the integrity of the load." [Id. at 95].

54.     Once he made contact with Mr. Choundoull, Officer Lucero (1) identified himself;

        (2) told Mr. Choundoull why he had been stopped; (3) requested that Mr. Choundoull

                                            12

lift the bed or bunk so that Officer Lucero could confirm he had necessary emergency equipment; and (4) asked to see Mr. Choundoull's paperwork.

55.    The paperwork that Officer Lucero asked to see included Mr. Choundoull's driver's licence, medical card, truck-trailer registration, logbook, and bills of lading.

56.    Mr. Choundoull provided all the requested paperwork and was "very cooperative" as he did so.  Officer Lucero testified that Mr. Choundoull did not appear to have trouble understanding him.

57.    Drivers of commercial vehicles are required to maintain a logbook, which Officer Lucero described as "basically like their diary." [Doc. 54 at 97].  The logbook records and shows such data as where a driver has been and for how long, how long the driver has been driving, and how long the driver has slept.

58.    When he reviewed Mr. Choundoull's logbook, Officer Lucero noticed that it was not current in that it did not record each change in duty status.  According to Officer Lucero, when Mr. Choundoull was pulled over, his logbook indicated that he was in his sleeper, which was not accurate.

59.    Accordingly, Officer Lucero wrote Mr. Choundoull another citation pursuant to NMSA § 65-3-11 and 49 C.F.R. § 395.8. [See Exh. 6].

60.    In the "Essential Facts" section of the citation, Officer Lucero wrote, "Last entry on 2/3/09 @ 11:59 pm." [Exh. 6].

61.    I find and accept as credible Officer Lucero's testimony that Mr. Choundoull's

logbook was not up to date.  I further find that it therefore was objectively reasonable for Officer Lucero to issue a citation for failure to keep a current record of duty status.

62.    Having determined that Mr. Choundoull had violated two provisions of the New Mexico Traffic Code, Officer Lucero decided to conduct a safety inspection of Mr. Choundoull's vehicle because, as he explained, "once the traffic stop is conducted on a commercial vehicle, we'll do a safety inspection, just to make sure that this vehicle is safe to go down the road." [Doc. 54 at 87].

63.    Officer Lucero has training in the North American Standard Inspection Procedures, which he received in 2001, as part of his beginning employment as an MTD officer. Officer Lucero completed the training and was certified in the North American Standard.  As such, he is authorized to enforce federal motor carrier laws that the State of New Mexico has adopted.

64.    Officer Lucero has conducted Level I and Level II inspections but estimated that "95 percent of the time [he will] do a Level II safety inspection." [Doc. 54 at 85-86].

65.    When questioned as to "any procedures or requirements" MTD officers follow when conducting Level II or Level III inspections, Officer Lucero responded, "Those are usually just officer discretion, whatever the officer feels like, what kind of inspection he feels like doing." [Doc. 54 at 85].

66.    The inspection that Officer Lucero conducted on Mr. Choundoull's vehicle was a Level II inspection.

14

67.     Officer Lucero began his Level II inspection by examining the exterior of Mr.

        Choundoull's vehicle, which was situated on the off-ramp of Interstate 40 exit 108,

        approximately five feet away from traffic.

68.     Officer Lucero testified that "[o]n the way up the driver's side, [he] checked the tires

        to make sure they were all good [and subsequently] checked the passenger side for

        any other infractions." [Doc. 54 at 99].

69.     Officer Lucero did not inspect the following:

        a.      vehicle inspection report;
        b.      exhaust system;
        c.      coupling devices;
        d.      windshield wipers;
        e.      wheels and rims;
        f.      steering mechanism;
        g.      turn signals;
        h.      vehicle frame; or
        i.      brake system.

70.     After checking the driver and passenger sides of the vehicle, Officer Lucero entered

        the trailer to conduct a cargo and securement check, the purpose of which, Officer

        Lucero testified, is to "check[] the loading and bracing of the load [and also to]

        verify[] the load with the bills." [Doc. 54 at 101].

71.     Officer Lucero also confirmed that his intent in entering the trailer was to perform a

        safety inspection, and that he was not searching for anything other than safety

        violations.

72.     Officer Lucero did not deploy his canine, Rodey, during the inspection.

73.     I find and accept as credible Officer Lucero's testimony that his intent in inspecting Mr. Choundoull's trailer was to search for safety violations.

74.     Exhibit 2 is a close-up photograph of the load that Mr. Choundoull was transporting on February 4, 2009.  It depicts a number of cardboard boxes under a plastic sheet. Behind the boxes and sheet are what appear to be twigs or trees, which are flush against a plywood wall. A bracing bar (also called "loading brakes") extends from one side of the trailer to the other and appears to hold the boxes in place.  [See Exh. 2].

75.     Exhibit 3 depicts an identical scene, but the photograph that is Exhibit 3 was taken from farther back in the trailer. [See Exh. 3].

76.     Officer Lucero estimated that the entire load extended back from the front of the trailer approximately ten feet.

77.     Officer Lucero also testified that the bracing bar was holding the cargo securely in place and, accordingly, he determined that Mr. Choundoull's cargo was secure and safely loaded and did not pose a safety issue for travel on New Mexico highways.

78.     Because Mr. Choundoull's bills of lading did not show that he was transporting "unmarked boxes[,]" Officer Lucero asked what they contained.

79.     When asked at the suppression hearing what Mr. Choundoull's response was, Officer Lucero stated:

> I really couldn't understand him because he had a real thick accent.  I asked him again, and again I still didn't understand

> him.  But the bills didn't show any unmarked boxes on there, so
> I went ahead and just cut open one of the boxes to verify it, and
> that's when I saw bundles of alleged marijuana.

[Doc. 54 at 104].

80.    Officer Lucero also explained that his purpose in cutting open the box was

> [i]t was unmarked. I wasn't sure what it was.  It wasn't 15 on
> the bills of lading. I wasn't sure if it was anything—if it was
> [Mr. Choundoull's] personal property or if it was something to
> make bombs, or I didn't know if it was something—safety to
> our community or the people of the community.

[Doc. 54 at 104].

81.    When he cut into the box, and subsequently into the bundle of marijuana itself,
Officer Lucero did not have a warrant, he did not have Mr. Choundoull's consent, and
he did not have reasonable suspicion or probable cause to believe that Mr.
Choundoull was engaged in drug trafficking.

82.    Officer Lucero further explained that as part of his training as an MTD officer, he has
been instructed that if he finds something that does not conform to the bill of lading,
he is to "open and verify that it is nothing illegal and make sure that it's not going to
harm the public." [Doc. 54 at 104].

83.    Officer Lucero testified that there is nothing in the NM Motor Transportation Act that
authorizes MTD officers to verify cargo contents.

84.    Rather, in the context of discussing Step 19 of a North American Standard level II
Inspection, he testified that "cargo verification" is "part of the Level II safety

inspection . . .  and it will state it in the inspection procedures." [Doc. 54 at 128].

85. Step 19 of a North American Standard Level II Inspection addresses cargo
securement and states:

> Where load is visible, check for proper blocking and bracing.
> It may be necessary to examine inside of trailer to assure that
> large objects are properly secured.
>
> Check cargo securement devises for proper number, size, and
> condition.  Check tie-down anchor points for deformation and
> cracking.

[Doc. 14 at 9].

86. Major Cordova confirmed that nothing in Step 19 "say[s] you can open" boxes or
cargo containers. [Doc. 54 at 76].

87. I find that Step 19 of a North American Standard Level II Inspection does not
authorize the verification of cargo contents.

88. Officer Lucero also testified that the § 65-5-1 of the NM Transportation Act provides
authority for a cargo search.

89. As set forth above,  § 65-5-1 of the NM Transportation Act is captioned "Vehicles
to stop at ports of entry; information; inspection," and provides, in pertinent part, that

> *the person in charge of the port of entry may confirm the*
> *contents of the cargo* and the weight thereof and is authorized
> to interview operators to obtain information in respect thereto
> and, if in doubt as to the declared gross weight, may order the
> cargo weighed before issuing any clearance certificate for the
> motor vehicle[. . . ;] may *inspect the contents of the vehicle* to
> determine whether all taxes on gasoline and motor fuel and
> excise taxes on alcoholic liquors and all taxes on any other

> property have been fully paid[. . . ; and] *may inspect the vehicle and its contents* to determine whether all laws and all rules and regulations of the departments of this state with respect to public safety, health, welfare and comfort have been fully complied with.

N.M. STAT. ANN. § 65-5-1(C), (D), (E) (emphasis added).

90.     I find that § 65-5-1 of the NM Transportation Act does not authorize the verification of cargo contents outside the confines of designated ports of entry.

91.     For his part, Major Cordova similarly was asked the following question:

> *Would you agree with me that with regard to the [Level I inspection] standard, nowhere does it talk about a cargo inspection of the contents of boxes or other aspects within the load, itself?*

He responded:

> *I wouldn't say cargo inspection. If you're talking about the securement of cargo, yes, under safe loads and projecting loads.*

[Doc. 54 at 44].

92.     Step 19 of a North American Standard Level I Inspection is identical to Step 19 of a Level II Inspection. See Exh. 13.

93.     I find that Step 19 of a North American Standard Level I Inspection does not authorize the verification of cargo contents.

94.     Major Cordova also testified that nothing in appendix G specifically authorizes "cargo verification." [Doc. 54 at 49].

95.     Finally, Major Cordova was questioned about whether any provision of the NM

Transportation Act authorizes a roadside cargo inspection (as opposed to a port-of-entry cargo inspection).  He was asked:

> *So we can agree that with specificity, you have a statutory authority under New Mexico law to examine a  vehicle and its contents at a port-of-entry, and there's no comparable provision for roadside inspection? That much we can agree on, correct?*
> *. . .*
> *In terms of a specific grant of authority to inspect so that carriers are put on notice of what may happen when they conduct interstate commerce in the state of New Mexico, are they put on notice that there might be roadside inspections of their cargo?*

He responded:

> *Not specifically, no.*

[Doc. 54 at 52].

## II.   LEGAL ANALYSIS AND CONCLUSIONS OF LAW

On May 13, 2009, Mr. Choundoull filed his *Motion to Suppress*, seeking to exclude all evidence obtained from what he contends was an unlawful search of his trailer on February 4, 2009.  He argues that (1) Officer Lucero's initial stop for defective identification lamp was not justified; (2) despite Officer Lucero's unjustifiable prolonging of the stop, he still did not develop a reasonable articulable suspicion of criminal activity and, therefore, there was no basis on which to search the trailer; and (3) Officer Lucero's actions were not authorized by Burger v. United States.  [See generally Doc. 38].  The government responds that Officer Lucero had probable cause to initiate the stop of Mr. Choundoull's vehicle and,

therefore, authority to conduct a "roving roadside inspection[.]" [Doc. 41 at 3].

### A.     The Initial Stop

"A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'"  United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir. 1998) (*quoting* Delaware v. Prouse, 440 U.S. 648, 653 (1979).  Since an ordinary traffic stop is analogous to an investigative detention, the Court analyzes such a stop under the principles pertaining to investigatory detentions set forth in Terry v. Ohio, 392 U.S. 1 (1968).  United States v. Tibbetts, 396 F.3d 1132, 1136 (10th Cir. 2005). To determine the reasonableness of an investigative detention, the Court conducts a two-part inquiry, asking first whether the officer's action was justified at its inception, and, second, whether it was reasonably related in scope to the circumstances justifying the interference in the first place.  Hunnicutt, 135 F.3d at 1348.

In a routine traffic stop, an officer may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation.  United States v. Gregoire, 425 F.3d 872, 879 (10th Cir. 2005).  Once those tasks are completed, however, a driver must be allowed to proceed on his way unless (1) reasonable suspicion exists that the driver is engaged in criminal activity, or (2) the driver consents to additional questioning.  Id.

A traffic stop will be deemed valid so long as the initiating officer had "a reasonable articulable suspicion that a traffic or equipment violation ha[d] occurred or [was] occurring."

Hunnicutt, 135 F.3d at 1348.  Indeed, one proposition for which Hunnicutt stands is that "[Tenth Circuit] cases make clear that the government need not show a violation actually occurred to justify an initial traffic stop."  Id.  Moreover, "[i]t is irrelevant that the officer may have had other subjective motives for stopping the vehicle."  Id.   Instead, the sole inquiry "is whether the particular officer had reasonable suspicion that the particular motorist violated 'any  . . . of the multitude of applicable traffic and equipment regulations' of the jurisdiction."  Id. (quoting Prouse, 440 U.S. at 661); see also Gregoire, 425 F.3d at 876-879 (stop justified at inception where it was based on trooper's observed failure of driver to signal before merging into highway traffic).  On the other hand, a pretextual stop occurs when an officer uses some legal justification to stop a person or vehicle in order to investigate unrelated criminal matters for which the officer lacks reasonable suspicion. United States v. Fernandez, 18 F.3d 874, 876 (10th Cir. 1994).

In this case, I find that Officer Lucero's stop of Mr. Choundoull's commercial vehicle was justified at its inception on the basis of Officer Lucero's reasonable, articulable suspicion that Mr. Choundoull was operating his vehicle in violation of 49 C.F.R. § 393.9. Section 393.9 of Title 49 of the Code of Federal Regulations is captioned "Lamps operable, prohibition of obstructions of lamps and reflectors" and provides, in pertinent part, that "[l]amps and reflective devices/material required by this subpart must not be obscured by the tailboard, or by any part of the load, or its covering by dirt, or other added vehicle or work equipment, or otherwise."  49 C.F.R. § 393.9(b).  Officer Lucero credibly testified at

the suppression hearing that he observed two of Mr. Choundoull's three identification lamps to be inoperative.  Exhibit 1 depicts the three identification lamps on Mr. Choundoull's commercial vehicle and the two outer lamps do appear to be at least partially obstructed by either mud or tape.  See Exh. 1.

For his part, Mr. Choundoull credibly testified that he believed his identification lamps were working because, among other things, inspectors at the Ehrenberg, Arizona port of entry had, on February 3, 2009, certified that he had repaired a defective headlamp for which he was cited in California on January 20, 2009.  However, he also agreed that the inspectors' certification spoke only to the fact that the *headlamp violation* had been corrected.  The certification did not address the identification lamps.

For these reasons, I find that Officer Lucero possessed a reasonable articulable suspicion that, on February 4, 2009, Mr. Choundoull was operating his commercial motor vehicle in violation of 49 C.F.R. § 393.9(b).  Officer Lucero therefore was justified in making the initial stop of Mr. Choundoull's vehicle.

### B.      The Events Following the Initial Stop

#### 1.      Consent and Reasonable Suspicion

As stated above, an officer conducting a routine traffic stop may request a driver's license and vehicle registration, run a computer check, and issue a citation. Hunnicutt, 135 F.3d at 1349.  "The investigative detention usually must 'last no longer than is necessary to effectuate the purpose of the stop,' and '[t]he scope of the detention must be carefully

tailored to its underlying justification.'" Id. (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).  Notwithstanding this general rule, lengthening the detention for further questioning beyond that related to the initial stop is permissible where (1) the officer develops an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention has become a consensual encounter.  Hunnicutt, 135 F.3d at 1349.

In this case, there has been no allegation that the encounter between Officer Lucero and Mr. Choundoull ever became consensual.[3]  Nor did Officer Lucero testify to having developed an objectively reasonable and articulable suspicion that *illegal* activity was occurred or was occurring.  Instead, Officer Lucero testified that his concern was *safety*.  To be sure, among the documents that Officer Lucero reviewed was Mr. Choundoull's logbook, which Officer Lucero noted was not up to date.  Failure to update a logbook is a violation of  49 C.F.R. § 395.8, which is captioned "Driver's record of duty status" and provides, in pertinent part, that "every motor carrier shall require every driver used by the motor carrier to record his/her duty status for each 24 hour period [and that d]rivers shall keep their records of duty status current to the time shown for the last change of duty status."  49 C.F.R.  § 395.8(a), (f)(1). Officer Lucero cited Mr. Choundoull for this violation.  Further evidence that Officer Lucero's concern was safety and *not* criminal activity is the fact that,

_____

[3]  In fact, Officer Lucero affirmatively testified that he searched Mr. Choundoull's cargo without Mr. Choundoull's consent. [See Doc. 54 at 141].

even though Officer Lucero's canine partner, Rodey, was with him that day, Officer Lucero never deployed the dog. Moreover, Officer Lucero testified that he did not even smell marijuana until *after* he had cut into one of the packages. Thus, I find that the initial detention here never became a consensual encounter and, further, that Officer Lucero did not develop an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring.[4]

## 2.    *New York v. Burger*, 482 U.S. 691 (1987)

Notwithstanding that the search of Mr. Choundoull's vehicle cannot be premised upon either consent or Officer Lucero's having developed a reasonable, articulable suspicion of criminal activity, the government asserts that the warrantless search was nevertheless valid as an inspection of a closely regulated business.

In New York v. Burger, the United States Supreme Court considered the privacy interests of an owner of commercial premises, as against the interests of the government in regulating particular businesses. The Court explained:

> Because the owner or operator of commercial premises in a "closely regulated" industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, . . . have lessened application in this context. Rather, . . . as in other situations of

---

[4] The government concedes as much in the *United States' Response to Defendant's Motion to Suppress (Doc. 38)*, where it contends *not* that Officer Lucero ever developed a reasonable, articulable suspicion of *criminal* activity but, instead, "a reasonable, articulable suspicion of *unsafe* activity" on the grounds of the identification-lamp and logbook violations. [See Doc. 41 at 7 (emphasis added)].

> "special need," . . . where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment.

New York v. Burger, 482 U.S. 691, 702 (1987) (internal citations omitted).

Still, even in the context of a pervasively regulated business, a warrantless inspection will be deemed reasonable only if the following three criteria are satisfied: (1) there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made; (2) the warrantless inspection must be necessary to further the regulatory scheme; and (3) the statute's inspection program must provide, in terms of the certainty and regularity of its application, a constitutionally adequate substitute for a warrant, meaning "it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." Burger, 482 U.S. at 703. With respect to "advis[ing] the owner"

> the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes. In addition, in defining how a statute limits the discretion of the inspectors . . . it must be "carefully limited in time, place, and scope."

Id. (internal citations omitted).

The Tenth Circuit has expressly held that "[c]ommercial trucking is a closely regulated industry[,]" United States v. Gwathney, 465 F.3d 1133, 1138 (10th Cir. 2006), and therefore subject to Burger's three-part test. The Tenth Circuit also has expressly held that

"safety inspections of commercial carriers satisfy the first prong of the <u>Burger</u> test[, as 't]he state clearly has a substantial interest in regulating [commercial carriers] to protect public safety on the highways.'" <u>United States v. Vasquez-Castillo</u>, 258 F.3d 1207, 1211 (10th Cir. 2001) (*quoting* <u>V-1 Oil Co. v. Means</u>, 94 F.3d 1420, 1426 (10th Cir. 1996)).  Additionally, the circuit has previously determined that New Mexico's safety-inspection statutes satisfy the second prong of the <u>Burger</u> test because "routine safety inspections are necessary to further the regulatory scheme governing commercial carriers[, since] "'commercial carriers . . . pass quickly through states and out of the jurisdiction of the enforcement agencies.'" <u>Id.</u> (*quoting* <u>United States v. Dominguez-Prieto</u>, 923 F.2d 464, 469 (6th Cir. 1991)).

As for satisfying the third prong of the <u>Burger</u> test, the Tenth Circuit has found that § 65-5-1 of the NM Motor Transportation Act "provides adequate notice to owners and operators of commercial carriers that their property will be subject to periodic inspections *and adequately limits the discretion of inspectors in place and scope*." <u>Vasquez-Castillo</u>, 258 F.3d at 1211 (emphasis added).  Subsection (F)[5] of § 65-5-1 authorizes "inspect[ion of] the vehicle *and its contents*" for the purpose of ensuring that the commercial vehicle is safe for operation on the State's highways.  <u>Id.</u> (*quoting* N.M. STAT. ANN. § 65-5-1(F) (emphasis added)).  However, by its express terms, § 65-5-1 is limited to inspections carried out at the

---

[5]  Subsections (D) and (E) also authorize inspection of the contents of the cargo and the content of the vehicle to verify, respectively, weight and payment of taxes.  N.M. STAT. ANN. § 65-5-1(D), (E).

State's ports of entry.  Notwithstanding this express limitation, the government again[6] "seeks to expand this regulatory scheme to permit warrantless roadside inspections of the commercial trucking industry by roving patrols during traffic stops that occur outside the boundaries of the State of New Mexico's ports of entry."  United States v. Landell, 2007 WL 2712962, at *7 (D.N.M. Jun. 22, 2007).

It bears repeating that, to satisfy the third prong of the Burger test, a regulatory scheme,

> in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant [inasmuch as] it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it *must limit the discretion of the inspecting officers*.

Burger, 482 U.S. at 703 (emphasis added) (internal citations omitted).  Section 65-5-1 of the New Mexico Motor Transportation Act passes judicial muster because it limits the discretion of inspecting officers by, among other things, (1) authorizing inspections at designated ports of entry (thereby limiting the permissible location of the inspection); (2) allowing verification of the weight of the contents of the cargo (thereby limiting the scope of the inspection); and (3) permitting inspection of the contents of the vehicle and the cargo to ensure that (a) all applicable taxes have been paid, and (b) all laws and all rules and regulations of the departments of the State of New Mexico with respect to public safety,

---

[6]  See United States v. Heath, 08cr451 JEC; Landell, 2007 WL 2712962.

health, welfare and comfort have been fully complied with (again, limiting the scope of the inspection).

By contrast, neither Major Cordova nor Officer Lucero could direct the Court during the suppression hearing in this matter to a provision, either in the New Mexico statutes or the Code of Federal Regulations, expressly authorizing *roadside* inspections, searches, or verifications of contents of cargo.  For his part, Major Cordova testified generally that "Part 396" of the Federal Motor Carrier Safety Act authorizes MTD officers "[t]o inspect commercial vehicles in operation in interstate commerce." [Doc. 54 at 30].  Section 396.9 of Title 49 of the Code of Federal Regulations is captioned "Inspection of motor vehicles in operation." 49 C.F.R. § 396.9.  Nowhere in § 396.9, however, is cargo or vehicle contents mentioned.  See id.

Major Cordova then was asked to point to the provision or provisions of the North American Standard Inspections, whether Level I, Level II, or Level III, that authorizes "an inspection of the contents of the cargo." [Doc. 54 at 43].   Without citing to a particular provision, Major Cordova responded, "If you're talking about securement of cargo . . . under safe loads and projecting loads."  He also, however, replied that he "wouldn't say *cargo inspection*." [Id. at 44 (emphasis added)].

Finally, Major Cordova cited appendix G to 49 C.F.R. §396.17(a) in support of his belief that cargo verifications are allowed under federal law.  After having reviewed a copy of appendix G, however, Major Cordova clarified that "[t]here is no specific authority that

says we can do cargo verification." [Doc. 54 at 49].

Major Cordova next was asked what provision of the NM Motor Transportation Act gives MTD officers authority to conduct roadside cargo or contents inspections, comparable to the express authority given to port-of-entry inspectors in § 65-5-1.  Although he cited to §§ 65-1-6 and 65-1-9, which generally direct MTD officers to enforce state and federal motor carrier laws, he also confirmed that the NM Motor Transportation Act "does not say specifically to conduct inspections[,]" and agreed that nothing in the New Mexico statutes "specifically" put commercial motor vehicles in the State of New Mexico on notice that their vehicles were subject to roadside cargo inspections. [Doc. 54 at 51, 52].

While Major Cordova's testimony centered largely on notice (or lack thereof) provided to commercial carriers by Title 49 of the Code of Federal Regulations, the NM Motor Transportation Act, and the North American Standard Inspection Procedures, Officer Lucero's testimony was illuminating both in terms of the notice that is or is not provided and in demonstrating how MTD officers possess seemingly unlimited discretion to inspect and search commercial motor vehicles and their contents and cargo.

I note as an initial matter that, when asked whether MTD officers are authorized by the NM Motor Transportation Act to conduct load verifications outside of designated ports of entry, Officer Lucero replied, "*[O]ut of the port, I couldn't tell you if it's allowed or not, but I know it's part of the Level II safety inspection to do a cargo verification, and it will state it in the inspection procedures.*" [Doc. 54 at 128 (emphasis added)].  While Officer

Lucero admitted that nothing in the North American Standard Inspection Procedures authorizes load verification, he testified that MTD officers' authority to conduct a cargo inspection comes from § 65-5-1 of the NM Motor Transportation Act.  By its express terms, however, § 65-5-1 limits cargo or contents inspections to those done at designated ports of entry.  See N.M. STAT. ANN. § 65-5-1.  Officer Lucero also explained that authority to search contents or cargo comes from MTD supervisors, since MTD officers do "[w]hat [they are] told to do [and] take orders, just like anybody else." [Doc. 54 at 128-129].

Even more troubling was Officer Lucero's testimony with respect to the wide discretion that MTD officers apparently are afforded in conducting inspections.  I first note Officer Lucero's suggestion that MTD officers are on their own to decide what level of inspection to conduct roadside.  To be sure, when asked, "Are there any procedures or requirements that you have to follow in order to conduct a Level II or Level III inspection on the side of the road?" Officer Lucero replied, "Those are usually just officer discretion, *whatever the officer feels like, what kind of inspection he feels like doing*." [Doc. 54 at 85 (emphasis added)].

Officer Lucero's exercise of unlimited discretion is evident in the Level II safety inspection he conducted on Mr. Choundoull's vehicle.  When questioned as to whether MTD officers have "unbridled discretion" to conduct inspections, Officer Lucero responded, "As long as we get everything done that's required here, it doesn't matter how we do it." [Doc. 54 at 129].  Yet Officer Lucero did not "get everything done that" was required.

31

As previously explained, a Level II inspection includes *at a minimum*,

> examination of: driver's license, medical examinees certificate and waiver, if applicable, alcohol and drugs, driver's record of duty status as required, hours of service, seat belt, vehicle inspection report, brake system, coupling devices, exhaust system, frame, fuel system, turn signals, brake lamps, tail lamps, head lamps, lamps on projecting loads, safe loading, steering mechanism, suspension, tires, van and open-top trailer bodies, wheels and rims, windshield wipers, emergency exits on buses, and HM requirements, as applicable.

[Exh. A at 1].  Officer Lucero, however, testified that he did not inspect Mr. Choundoull's vehicle inspection report; exhaust system; coupling devices; windshield wipers; wheels and rims; steering mechanism; turn signals; vehicle frame; or brake system. [Doc. 54 at 147-150].  But according to Major Cordova, the purpose in having MTD officers inspect, "at a minimum" those items set forth above is to eliminate discretion on the part of individual officers. [Id. at 50].  Notwithstanding, Officer Lucero testified that, in terms of following certain steps in conducting inspections pursuant to the NM Motor Transportation Act, "[i]t's up to, again, officer discretion, however they want to do their inspection.  I do my inspections totally different from the next officer."   [Id. at 129].

Possibly the greatest example of Officer Lucero's exercise of unfettered discretion came with his decision to cut into one of the unmarked boxes in Mr. Choundoull's trailer. According to Officer Lucero, when he entered Mr. Choundoull's trailer, he noticed that a bracing bar, or "loading brakes," was holding the cargo securely in place.  As a result, Officer Lucero determined that Mr. Choundoull's cargo was secure and safely loaded and

did not pose a safety issue for travel on New Mexico highways.  Nevertheless, Officer Lucero, whose safety concerns should at that point have been alleviated, decided to cut open an unmarked box in the trailer because when he asked Mr. Choundoull what the boxes contained, Mr. Choundoull's "real thick accent" prevented Officer Lucero from understanding the response. [Doc. 54 at 104].  It bears repeating that Officer Lucero testified that, when he cut open the box, he did not have a warrant, nor did he have Mr. Choundoull's consent.  By his own admission, he did not have reasonable suspicion or probable cause to believe that Mr. Choundoull was engaged in drug trafficking.  Officer Lucero did not deploy his canine partner, Rodey, who was with him at the time, nor did Officer Lucero even smell marijuana when he first entered Mr. Choundoull's trailer.  It was not until after he cut into one of the bundles of marijuana that he smelled the substance.

Burger requires, among other things, that a statute's inspection program provide, in terms of the certainty and regularity of its application, a constitutionally adequate substitute for a warrant, meaning "it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers."  Burger, 482 U.S. at 703.  Moreover,

> the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.  In addition, in defining how a statute limits the discretion of the inspectors . . . it must be "carefully limited in time, place, and scope."

Id. (internal citations omitted).  In this case, I find that nothing in the state or federal statutory schemes discussed herein advises a commercial carrier such as Mr. Choundoull that his cargo or the contents of his trailer will be subject to a roadside inspection, verification, or search.  I also find that the nearly unlimited discretion about which Officer Lucero testified, and which he appears to have exercised here, removes his February 4, 2009 search of Mr. Choundoull's trailer from the protections of Burger, which demands that officer discretion be carefully limited in time, place, and scope.  For these reasons, and because Officer Lucero admittedly lacked a warrant, consent to search, reasonable suspicion of criminal activity, or probable cause, all evidence—tangible and verbal—obtained as a result of the search of Mr. Choundoull's vehicle on February 4, 2009 will be suppressed.

## III.   <u>CONCLUSION</u>

For the reasons set forth herein, Defendant Ameth Choundoull's *Motion to Suppress* is granted.  All tangible and verbal evidence obtained as a result of Officer Hermilo Lucero's the search of Mr. Choundoull's vehicle on February 4, 2009 will be excluded.

**IT IS, THEREFORE, ORDERED** that Defendant Ameth Choundoull's *Motion to Suppress* [Doc. 38] is **GRANTED;**

**IT IS FURTHER ORDERED** that all tangible and verbal evidence obtained as a result of the search of Mr. Choundoull's vehicle on February 4, 2009 shall be suppressed.

**SO ORDERED** this 22nd day of September, 2009, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

35